**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 9:21-cv-80894-WPD**

BERNARD COHEN, individually
and on behalf of all others similarly situated,                **CLASS ACTION**

     *Plaintiff*,

vs.

NEWSMAX MEDIA, INC.,                                         **JURY TRIAL DEMANDED**
a Delaware Corporation,

     *Defendant*.

_____/

## FIRST AMENDED CLASS ACTION AND INDIVIDUAL COMPLAINT

Plaintiff, Bernard Cohen (hereinafter "Plaintiff"), individually, and on behalf of all others similarly situated, by way of his Class Action Complaint and Jury Demand, brings this class action under Rule 23 of the Federal Rules of Civil Procedure against Newsmax Media, Inc. ("Newsmax or "Defendant") for its violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (hereinafter the "TCPA"), and the regulations promulgated thereunder. Plaintiff brings individual claims against Defendant for its violations of the Florida Deceptive and Unfair Trade Practices Act, Fl. St. § 501.201 et seq. (hereinafter the "FDUTPA"). In support, Plaintiff alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff brings class and individual claims against Defendant and seeks damages, injunctive relief, and anyother available legal or equitable remedies for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"), and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA").

2.    Plaintiff's class action claim relates to Defendant's negligent or willful violation of the TCPA and invasion of Plaintiff's privacy by repeatedly contacting Plaintiff on Plaintiff's

1

residential telephone line despite Plaintiff having registered his number on the National Do-Not-Call Registry.

3.      "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the [FCC]."[1] The TCPA is designed to protect consumer privacy by, among other things, creating a private right of action against companies that engage in telemarketing without instituting appropriate do-not-call procedures. 47 C.F.R. 64.1200(d).

4.      Plaintiff's individual claims relate to Defendant's deceptive and predatory telephone advertising, sales, billing and renewal practices regarding its various media products and magazine subscriptions. Over an approximately 22-month period, Defendant repeatedly called Plaintiff, a nonagenarian suffering from dementia, and deliberately and continuously deceived and defrauded him on the phone into purchasing its products and subscriptions through various scam "special offers," "special prices," "automatic renewals" and other fake promotional discounts. Defendant fraudulently sold at least thirteen separate products and subscriptions to Plaintiff and repeatedly charged him multiple times for the same subscriptions, including by way of premature and fraudulent renewals. This unlawful conduct resulted in Plaintiff being charged thousands of dollars for unwanted duplicate magazine subscriptions, all of which violates the FDUTPA.

5.      Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## JURISDICTION AND VENUE

6.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §

---

[1] *In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961, ¶ 1 (2015).

1331 and 47 U.S.C. § 227. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

7.      Jurisdiction over Plaintiff's claims for declaratory relief is conferred by 28 U.S.C. § 2201.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this case occurred in this District, including Defendant's transmission of the unlawful, deceptive, and unwanted calls to Plaintiff.

9.      The Court has personal jurisdiction over Defendant because it conducts business in this state, markets its services within this state, and has availed itself to the jurisdiction of the State of Florida by placing calls to Plaintiff and Class Members in and from this state.

## PARTIES

10.     Plaintiff is more than ninety years old and domiciled in Palm Beach County, Florida.

11.     Defendant, Newsmax Media, Inc., a Delaware Corporation, is a citizen of the state of Florida and registered in the state of Florida, listing its principal address at 750 Park of Commerce Dr., Suite 100, Boca Raton, Florida 33487.

12.     Defendant holds itself out as "the one source that brings you in-depth cover stories and hard hitting investigative reports that you can't find in mainstream media outlets."[2]

13.     Defendant uses deceptive pricing and other unscrupulous and misleading sales practices to promote and market its various media products and magazine subscription sales by

_____

[2] https://www.newsmax.com/mktnews/Newsmax-Conservative-Magazine-NewsmaxTV/2002/02/28/id/664637/#:~:text=Newsmax%20Magazine%20is%2%200the%20one,MSNBC%20and%20many%20other%20outlets [as of July 1, 2021].

calling wireless phone users in violation of the TPCA and FDUTPA.

14.     Defendant, directly or through other persons, entities or agents acting on its behalf, conspired to, agreed to, contributed to, authorized, assisted with, and/or otherwise caused all of the wrongful acts and omissions, including the dissemination of the unsolicited calls and deceptive sales practices that are the subject matter of this Complaint.

## FACTUAL ALLEGATIONS RELATED TO PLAINTIFF'S CLASS ACTION CLAIMS

15.     At all times relevant, Plaintiff, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39). Defendant is a citizen of the State of Florida, and at all times mentioned herein was, a corporation and "persons," as defined by 47 U.S.C. § 153 (39).

16.     Upon information and belief, Plaintiff alleges that Defendant Newsmax targets senior citizens, like Plaintiff, in its telemarketing campaigns and places repeated calls to them.

17.     In a twelve-month period, Defendant has placed two or more telephone calls to Plaintiff's DNC-registered telephone number.

18.     Plaintiff only has a cellular telephone line which he uses for residential purposes; he cancelled his landline telephone prior to 2018. Plaintiff registered his cellular phone number with the Do Not Call registry on July 30, 2009.

### Defendant Engaged in a Pattern and Practice of Prohibited Behavior

19.     Beginning on or about November 6, 2019, the Defendant – whether a direct employee, agent, or someone acting on behalf of Newsmax– called Mr. Cohen approximately twelve times to sell him magazine subscriptions.

20.     On November 6, 2019, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. That same day, Newsmax charged Mr. Cohen's Discover credit card $89.85, for three different magazine subscriptions. The call was placed from the number (561) 231-6995.

21.     Upon information and belief, Plaintiff alleges that the telephone number (561) 231-6995 is owned and operated by Defendant and purports to use this number for customer service and fulfillment purposes.

22.     On November 12, 2019, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. That same day, Newsmax charged Mr. Cohen's Discover credit card another $188.90, for three more subscriptions.

23.     On November 20, 2019, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. The next day, Newsmax charged Mr. Cohen's Discover credit card $126.85, for three more subscriptions. The call was placed from the number (561) 231-6995.

24.     On November 27, 2019, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. That same day, Newsmax charged Mr. Cohen's Discover credit card $699.85 for seven subscriptions. The call was placed from the number (561) 231-6995.

25.     On November 27, 2019, there were two identical charges of $69.00, on Mr. Cohen's Discover card for subscriptions to "NMX Dividend Machine." Newsmax had charged Mr. Cohen $109.00, for the same publication just six days earlier.

26.     On December 2, 2019, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. That same day, Newsmax charged Mr. Cohen's Discover card $172.90. The call was placed from the number (561) 231-6995.

27.     In 2019, the Defendant called Mr. Cohen to sell him magazine subscriptions no fewer than twelve times. The Defendant charged his credit card $1,518.85. Many of these subscriptions were for publications that Mr. Cohen never authorized, did not want, or already had subscriptions to.

**<u>Defendant's Prohibited, Fraudulent Behavior Continued into 2020</u>**

28.     On January 4, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. That same day, Newsmax charged Mr. Cohen's Discover card $71.90, for two subscriptions. The call was placed from the number (561) 231-6995.

29.     On January 16, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. The next day, Newsmax charged Mr. Cohen's Discover card $150.85. The call was placed from the number (561) 231-6995.

30.     On January 30, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. The next day, Newsmax charged Mr. Cohen's Discover card $304.80, for two more subscriptions. The call was placed from the number (561) 231-6995.

31.     One of the subscriptions sold to Mr. Cohen that day was for Newsmax Magazine, and Mr. Cohen was charged $111.85. Just two months earlier he had been sold a subscription to Newsmax Magazine for $39.95; and one month before that he had been sold a subscription to Newsmax Magazine for $29.95.

32.     On February 1, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. The next day, Newsmax charged Mr. Cohen's Discover card $124.85, for the "Dr. Crandall Report." The call was placed from the number (561) 231-6995.

33.     Newsmax advertises that the annual subscription price of the Dr. Crandall Report is $54.95. Newsmax previously charged Mr. Cohen $54.95, on August 5, 2019 – less than six months earlier – for a subscription to the Dr. Crandall Report.

34.     On March 3, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. The next day, Newsmax charged Mr. Cohen's

Discover card $194.00. The call was placed from the number (561) 231-6995.

35.     On July 2, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. Five days later, Mr. Cohen's Citibank debit card was charged $71.90, for "The Mind Health report." The call was placed from the number (561) 231-6995.

36.     Newsmax's advertised price for a subscription to The Mind Health Report is $39.9,5 for one year, $69.95, for a two-year subscription, and $89.85, for a three-year subscription. In addition to the to the July 7th charge, Newsmax previously charged Mr. Cohen $39.95, for the Mind Health report on November 12, 2019; charged him $35.95, again on November 21, 2019; charged him $35.95, yet again on January 4, 2020; and $71.90, on July 7, 2020.

37.     On July 8, 2020, Newsmax or someone acting on its behalf called Plaintiff twice for the purpose of selling magazine subscriptions. Five days later, Newsmax charged Mr. Cohen's Citibank debit card $235.00. The call was placed from the number (561) 231-6995.

38.     One of the charges on January 13th was for the NMX "High Income Factor" in the amount of $166.00. Newsmax subsequently charged Mr. Cohen $194.00, on March 4, 2020 for the samepublication. Newsmax advertises the annual subscription price for the print edition of The High Income Factor is $109.95.

39.     On July 17, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. Four days later, Newsmax charged Mr. Cohen's Citibank debit card $140.85, for a subscription to Newsmax Magazine. The call was placed from the number (561) 231-6995.

40.     Newsmax advertises the one-year subscription price of Newsmax Magazine is $39.95, with automatic renewal at "the lowest renewal rates then in effect." Newsmax charged Mr. Cohen's credit card for subscriptions to Newsmax Magazine on November 6, 2019 ($29.95); on

December 2, 2019 ($39.95); on January 31, 2020 ($11.85); on July 24, 2020 ($140.85); and on December 10, 2020 ($89.95).

41.     On July 22, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. Two days later, Newsmax charged Mr. Cohen's Citibank debit card $54.95. The call was placed from the number (561) 231-6995.

42.     On August 3, 2020, Newsmax or someone acting on its behalf called Plaintiff for the purpose of selling magazine subscriptions. Three days later, Newsmax charged Mr. Cohen's Citibank debit card $69.00. The call was placed from the number (561) 231-6995.

43.     In 2020, the Defendant called Mr. Cohen at least ten times. Newsmax charged Mr. Cohen's Discover credit card or his Citibank debit card $1,563.00.

**Defendant's Prohibited, Fraudulent Behavior Continued into 2021**

44.     In 2021, the Defendant contacted Mr. Cohen by telephone numerous times. These improper telephone calls resulted in Newsmax charging Mr. Cohen  $995.95.

45.     Not only did Defendant make unsolicited calls to Plaintiff, it engaged in numerous deceptive acts.

46.     On February 24, 2021, Elizabeth Casper, who works as one of Mr. Cohen's care managers, called Newsmax Magazine's customer service at 1-800-485-4350. She spoke with a representative named Abdoolah to cancel the subscriptions. While speaking with Abdoolah, the representative told Ms. Casper that Mr. Cohen had called the company on February 15, 16, and 20 of 2021. That was patently false, as the attached telephone bill (**Exhibit A**) make clear. Mr. Cohen's Verizon phone records show that he made no outgoing calls on those days.

47.     While Ms. Casper was on the phone with the Newsmax representative, Mr. Cohen's cell phone rang and he answered it. Mr. Cohen was sitting at the dining room table with Ms. Casper, and she could hear not just Mr. Cohen's side of the conversation, but heard the caller

8

identify himself as calling from NMX. (All bills from Newsmax contain the designation "NMX" plus the individual magazine name.) Ms. Casper placed Abdoolah on hold, and took Mr. Cohen's phone.

48.     The person who had called Mr. Cohen identified himself as Justin Miller, a representative of NMX, and gave this address: 760 Park of Commerce Drive, Boca Raton, FL 33487. (That is the corporate address of Newsmax Media, Inc.)  He gave this phone number: 561-375-5597. Mr. Miller told Ms. Casper that he had called Mr. Cohen on February 15, 16, and 20, 2021. There are no inbound phone calls to Mr. Cohen's phone from that number.

49.     Abdoolah's statement to Ms. Casper that Mr. Cohen called Newsmax on February 15, 16, and 20, 2021 was not only false, but contradicted by Mr. Miller.

50.     On March 4, 2021, Ms. Casper again called Newsmax Customer Service. She was told that Newsmax does not call individuals to offer subscriptions. The Newsmax representative then told Ms. Casper that representatives sometimes do call customers with "promotions".

51.     On that same March 4th call with Newsmax, the customer service representative told Ms. Casper that Mr. Cohen had placed several orders for magazines via the internet. That is patently impossible: Mr. Cohen does not own a computer, does not have internet service in his home, or have an internet-enabled phone. Mr. Cohen does not know how to text or use voicemail on his phone.

52.     On that same March 4th call with Newsmax, Ms. Casper asked Abdoolah to remove Mr. Cohen's phone number. Abdoolah responded by saying she would "take him off completely."

53.     In a period of less than two years – from May 2019 through February 2021 – Newsmax telephoned Mr. Cohen dozens of times, and charged his credit card or debit card 49 times totaling $4,595.70.

54.     Many of the calls made to the Plaintiff were made from telephone number (561) 231-6995 which several websites, including RoboKiller.com, has identified as a phone number belonging to or being used by Newsmax to solicit magazine subscriptions.

55.     The telemarketing calls were made to Plaintiff's 2164 Number, and within the time period that is relevant to this action.

56.     At no time did Plaintiff provide Plaintiff's cellular number to Defendant through any medium, nor did Plaintiff consent to receive such unsolicited calls.

57.     Plaintiff has never signed-up for, and has never used, Defendant's services, and has never had any form of business relationship with Defendant.

58.     Plaintiff is the subscriber and sole user of the 2164 Number and is financially responsible for phone service to the 2164 Number, including the cellular costs and data usage incurred as a result of the unlawful calls made to Plaintiff by Defendant.

59.     Additionally, Plaintiff's 2164 Number has been registered on the National Do Not Call Registry since July 30, 2009.

60.     The content of the calls made to Plaintiff and the Class Members show that they were for the purpose of marketing, advertising, and promoting Defendant's business and products to Plaintiff as part of an overall telemarketing strategy.

61.     These calls were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

62.     Plaintiff did not provide Defendant or its agents prior express consent to receive calls, including unsolicited calls, to Plaintiff's cellular telephone, pursuant to 47 U.S.C. § 227(b)(1).

63.     The unsolicited calls by Defendant, or its agents, violated 47 U.S.C. § 227(b)(1).

64.     Defendant is and was aware that it is placing unsolicited calls to Plaintiff and other consumers without their prior express consent.

65.     Plaintiff was damaged by Defendant's calls. In addition to using Plaintiff's cellular data, phone storage, and battery life, Plaintiff's privacy was wrongfully invaded, and Plaintiff has become understandably aggravated with having to deal with the frustration of repeated, unwanted calls, forcing Plaintiff to divert attention away from Plaintiff's personal activities. Not only did the receipt of the calls distract Plaintiff away from Plaintiff's personal activities, Plaintiff was forced to spend time investigating the source of the calls and who placed them to him. *See Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200, 1211 (11th Cir. 2018). ("[T]ime wasting is an injury in fact"…. "[A] small injury… is enough for standing purposes").

66.     Defendant fraudulently charged Mr. Cohen multiple times for the same magazines and newsletters, costing him thousands of dollars.

67.     Plaintiff spent more than 12 minutes on the November 6, 2019 call, 2 minutes on the November 12, 2019 call, 8 minutes on the November 20, 2019 call, 10 minutes on the November 27, 2019 call, and 9 minutes on the December 2, 2019 call. Plaintiff spent more than 4 minutes on the January 24, 2020 call, 10 minutes on the January 16, 2020 call, and 14 minutes on the January 31, 2020 call. He spent more than 9 minutes on the February 1, 2020 call, and 6 minutes on the March 3, 2020 call. Likewise, Plaintiff spent 11 minutes on the July 2, 2020 call, a total of 13 minutes on the two July 8, 2020 calls, 16 minutes on the July 17, 2020 call, and 6 minutes on the July 22, 2020 call. Plaintiff spent 11 minutes on the August 3, 2020 call [and additional time on multiple calls during the rest of 2020 and early 2021.] Thus, Plaintiff has spent over two hours on the phone with Defendant on their multiple calls over a period of multiple years.

68.     Although Mr. Cohen is unable to investigate the source of these calls, his care manager Ms. Casper has spent considerable time on the phone with Newsmax and many hours

investigating the improper charges made by the Defendant on Mr. Cohen's credit card and debit card.

69.    These predatory sales calls further damaged Plaintiff because they resulted in Defendant charging Plaintiff's credit card and debit card more than $5,000 for unwanted, unordered, or duplicated magazine subscriptions.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this class action under rules 23(a) and 23(b)(2) & (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and of a similarly situated "Class" or "Class Members" defined as:

> **Do Not Call Registry Class:** **All persons in the United States who from four years prior to the filing of this action (1) were called by or on behalf of Defendant; (2) more than one time within any 12-month period; (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of selling Defendant's products and/or services; and (5) for whom Defendant claims (a) it did not obtain prior express written consent, or (b) it obtained prior express written consent in the same manner as Defendant claims it supposedly obtained prior express written consent to call the Plaintiff.**

> **Internal Do Not Call Class:** **All persons in the United States who from four years prior to the filing of this action through class certification (1) Defendant called after    the consumer asked for the calls to stop (2) within any 12-month period (3) for substantially the same reason Defendant called Plaintiff.**

71.    Excluded from the Class are: any Defendant, and any subsidiary or affiliate of that Defendant, and the directors, officers and employees of that Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

72.    This action has been brought and may properly be maintained as a class action against Defendant pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or otherwise modified.

73.     **Numerosity**: At this time, Plaintiff does not know the exact number of Class Members, but among other things, given the nature of the claims and that Defendant's conduct consisted of a standardized SPAM campaign calls placed to residential telephone numbers, Plaintiff believes, at a minimum, there are significantly greater than forty (40) Class Members. Plaintiff believes that the Class is so numerous that joinder of all members of the Class is impracticable and the disposition of their claims in a class action rather than incremental individual actions will benefit the Parties and the Court by eliminating the possibility of inconsistent or varying adjudications of individual actions.

74.     Upon information and belief, a more precise Class size and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to Defendant's calls and marketing records.

75.     Members of the Class may additionally or alternatively be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notice, e-mail notice, website notice, fax notice, first class mail, or combinations thereof, or by other methods suitable to this class and deemed necessary and/or appropriate by the Court.

76.     **Existence and Predominance of Common Questions of Fact and Law**: There is a well-defined community of common questions of fact and law affecting the Plaintiff and members of the Class. Common questions of law and/or fact exist as to all members of the Class and predominate over the questions affecting individual Class members. These common legal and/or factual questions include, but are not limited to, the following:

a.   How Defendant obtained the numbers of Plaintiff and Class members;

    b.   Whether Defendant engaged in telemarketing when it placed the calls which are the subject of this lawsuit;

    c.   Whether Defendant removed DNC-registered numbers from its call lists;

    d.   Whether the calls made to Plaintiff and Class Members violate the TCPA and its regulations;

    e.   Whether Defendant willfully or knowingly violated the TCPA or the rules prescribed under it;

    f.   Whether the calls made to Plaintiff and Class Members violate the Do Not Class Registry rules and regulations;

    g.   Whether Plaintiff and the members of the Class are entitled to statutory damages, treble damages, and attorney fees and costs for Defendant's acts and conduct;

    h.   Whether Plaintiff and members of the Class are entitled to a permanent injunction enjoining Defendant from continuing to engage in its unlawful conduct; and

    i.   Whether Plaintiff and the Class are entitled to any other relief.

77.    One or more questions or issues of law and/or fact regarding Defendant's liability are common to all Class Members and predominate over any individual issues that may exist and may serve as a basis for class certification under Rule 23(c)(4).

78.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same course of conduct that violates the TCPA.

79.    Defendant placed or caused to be placed at least two telephone calls during a twelve-month period to Plaintiff and members of the Class, promoting the sales of magazine subscriptions.

80. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. Plaintiff has retained counsel, who are competent and experienced in litigation in the federal courts, TCPA litigation and class action litigation.

81. **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class. While the aggregate damages which may be awarded to the members of the Class are likely to be substantial, the damages suffered by individual members of the Class are relatively small. As a result, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Plaintiff does not know of any other litigation concerning this controversy already commenced against Defendant by any member of the Class. The likelihood of the individual members of the Class prosecuting separate claims is remote. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and would protect the rights of each member of the Class. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

82. **Class-Wide Injunctive Relief and Rule 23(b)(2):** Moreover, as an alternative to or in addition to certification of the Class under Rule 23(b)(3), class certification is warranted under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to Plaintiff and

members of Class, thereby making appropriate final injunctive relief with respect to Plaintiff and Class Members as a whole.  Plaintiff seeks injunctive relief on behalf of Class Members on grounds generally applicable to the entire Class in order to enjoin and prevent Defendant Defendant's ongoing violations of the TCPA, and to order Defendant to provide notice to them of their rights under the TCPA to statutory damages and to be free from unwanted calls.

## FACTUAL ALLEGATIONS RELATED TO PLAINTIFF'S INDIVIDUAL CLAIMS

### Newsmax Magazine

83.     On November 6, 2019, Newsmax called Plaintiff and sold him a one-year subscription to *Newsmax Magazine* for $29.95.

84.     During that call on November 6, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Newsmax Magazine* came with "automatic renewal."

85.     Less than one month later, on December 2, 2019, Newsmax called Plaintiff again and fraudulently resold him another one-year subscription to the same *Newsmax Magazine* for $39.95, despite Plaintiff's already active subscription for *Newsmax Magazine*.

86.     During that call on December 2, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Newsmax Magazine* was a "discount" and came with "automatic renewal" after one year.

87.     Yet on January 30, 2020, Newsmax called Plaintiff again and fraudulently resold him another one-year subscription to *Newsmax Magazine* for $ 39.95, despite Plaintiff's already active subscription for *Newsmax Magazine*.

88.     During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Newsmax Magazine* was a "discount" and came with "automatic renewal" after one year.

89.     And yet again on July 17, 2020, Newsmax called Plaintiff again and fraudulently resold him yet another one-year subscription to *Newsmax Magazine* for $39.95, despite Plaintiff's already active subscription.

90.     During that call on July 17, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Newsmax Magazine* was a "discount" and came with "automatic renewal" after one year.

91.     Less than five months later on December 9, 2020, Newsmax again called Plaintiff and fraudulently sold him a three-year subscription to *Newsmax Magazine* for $89.95, despite Plaintiff's already active subscription for *Newsmax Magazine*.

92.     During that call on December 9, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the three-year subscription was a "discount," came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

93.     Barely two months later on February 16, 2021, Newsmax again called Plaintiff and fraudulently resold him another three-year subscription to *Newsmax Magazine* for $89.95, despite Plaintiff' already active subscription for *Newsmax Magazine*.

94.     During that call on February 16, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the three-year subscription was a "discount," came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

95.     And just over one month later, on March 24, 2021, Newsmax again called Plaintiff and fraudulently resold him yet another three-year subscription to *Newsmax Magazine* for $89.95, despite Plaintiff's already active subscription for *Newsmax Magazine*.

96.     During that call on March 24, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the three-year subscription was a "discount," came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

97.     In less than two years, between November 11, 2019 and March 24, 2021, Newsmax deceptively and fraudulently sold six *Newsmax Magazine* subscriptions to Plaintiff.

98.     Newsmax charged Plaintiff a total of $419.65, for *Newsmax Magazine* over the course of sixteen months.

**Health Radar**

99.     On August 19, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Health Radar*. Plaintiff was charged $4.95, shipping for this subscription.

100.    During that call on August 19, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Health Radar* would activate after the "free" three-month trial period.

101.    After the three-month trial period, on November 12, 2019, Plaintiff was charged $39.95, for the subscription to *Health Radar*, which Newsmax previously represented came with "automatic renewal."

102.    On November 20, 2019 – only eight days after Plaintiff was charged for a one-year subscription to *Health Radar* – Newsmax called Plaintiff again and fraudulently resold him another one-year subscription to *Health Radar* for $35.95, despite Plaintiff's already active subscription.

103.    During that call on November 20, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Health Radar* was a "discount" and came with "automatic renewal" after one year.

104.    Then, less than two later, on December 2, 2019, Newsmax called Plaintiff again and fraudulently resold him yet another one-year subscription to *Health Radar* for $35.95, despite Plaintiff's already active subscription.

105.    During that call on December 2, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Health Radar* was a "discount" and came with "automatic renewal" after one year.

106.    One month later, on January 4, 2020, Newsmax again called Plaintiff and resold him yet another one-year subscription to *Health Radar* for $35.95, despite Plaintiff's already active subscription.

107.    During that call on January 4, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Health Radar* was a "discount" and came with "automatic renewal" after one year.

108.    Shockingly, less than one month later, on January 30, 2020, Newsmax called Plaintiff yet again and resold him another one-year subscription to *Health Radar* for $35.95, despite Plaintiff's already active subscription.

109.    During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Health Radar* was a "discount" and came with "automatic renewal" after one year.

110.    On July 2, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Health Radar* for $35.95, despite Plaintiff's already active subscription.

111.    During that call on July 2, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Health Radar* was a "discount" and came with "automatic renewal" after one year.

112.     In less than one year, between August 19, 2019 and July 2, 2020, Newsmax deceptively and fraudulently sold five *Health Radar* subscriptions to Plaintiff.

113.     Newsmax charged Plaintiff a total of $224.65, for *Health Radar* over the course of eleven months.

**Mind Health Report**

114.     On August 19, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Mind Health Report*. Plaintiff was charged $4.95 shipping for this subscription.

115.     During that call on August 19, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Mind Health Report* would activate after the "free" three-month trial period.

116.     After the three-month trial period, on November 12, 2019, Plaintiff was charged $39.95, for the subscription to *Mind Health Report*, which Newsmax previously represented came with "automatic renewal."

117.     Yet on November 20, 2019 – only eight days after Plaintiff was charged for a one-year subscription to *Mind Health Report* – Newsmax called Plaintiff again and fraudulently resold him another one-year subscription to *Mind Health Report* for $35.95, despite Plaintiff's already active subscription.

118.     During that call on November 20, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Mind Health Report* was a "discount" and came with "automatic renewal" after one year.

119.     Shockingly, just one week later on November 27, 2019, Newsmax called Plaintiff yet again and fraudulently resold him another one-year subscription to *Mind Health Report* for $35.95, despite Plaintiff's already active subscription.

120.    During that call on November 27, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Mind Health Report* was a "discount" and came with "automatic renewal" after one year.

121.    Less than six weeks later on January 4, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Mind Health Report* for $35.95, despite Plaintiff's already active subscription.

122.    During that call on January 4, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Mind Health Report* was a "discount" and came with "automatic renewal" after one year.

123.    Outrageously, less than a month later on January 30, 2020, Newsmax yet again called Plaintiff and resold him another one-year subscription to *Mind Health Report* for $35.95, despite Plaintiff's already active subscription.

124.    During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Mind Health Report* was a "discount" and came with "automatic renewal" after one year.

125.    On July 2, 2020, Newsmax called Plaintiff again and fraudulently resold him another one-year subscription to *Mind Health Report* for $35.95, despite Plaintiff's already active subscription.

126.    During that call on July 2, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Mind Health Report* was a "discount" and came with "automatic renewal" after one year.

127.    In less than one year, between August 19, 2019 and July 2, 2020, Newsmax deceptively and fraudulently sold five *Mind Health Report* subscriptions to Plaintiff.

128.    Newsmax charged Plaintiff a total of $224.65, for *Mind Health Report* over the course of eleven months.

**Blaylock Wellness Report**

129.    On May 23, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Blaylock Wellness Report*. Plaintiff was charged $4.95 shipping for this subscription.

130.    During that call on May 23, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* would activate after the "free" three-month trial period.

131.    Yet prior to the expiration of the "free" three-month trial period, on August 5, 2019, Defendant prematurely ended the "free trial" and charged Plaintiff $54.95, without his consent for a one-year subscription to *Blaylock Wellness Report*.

132.    Just three months later on November 6, 2019, Newsmax called Plaintiff again and resold him another one-year subscription to *Blaylock Wellness Report* for $54.95, despite Plaintiff's already active subscription.

133.    During that call on November 6, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year.

134.    Shockingly, just two weeks later on November 20, 2019, Newsmax called Plaintiff again and resold him another one-year subscription to *Blaylock Wellness Report* for $54.95, despite Plaintiff's already active subscription.

135.    During that call on November 20, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year.

136.     And outrageously, just one week later on November 27, 2019, Newsmax called Plaintiff again and resold him another one-year subscription to *Blaylock Wellness Report* for $54.95, despite Plaintiff's already active subscription.

137.     During that call on November 27, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year.

138.     On January 30, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Blaylock Wellness Report* for $54.95, despite Plaintiff's already active subscription.

139.     During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year.

140.     On July 22, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Blaylock Wellness Report* for $54.95, despite Plaintiff's already active subscription.

141.     During that call on July 22, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year.

142.     On February 16, 2021, Newsmax called Plaintiff again and sold him a five-year subscription to *Blaylock Wellness Report* for $229.00, despite Plaintiff's already active subscription.

143.     During that call on February 16, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the five-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

23

144.    On March 25, 2021, Newsmax called Plaintiff again and resold him another five-year subscription to *Blaylock Wellness Report* for $229.00, despite Plaintiff's already active subscription.

145.    During that call on March 25, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the five-year subscription to *Blaylock Wellness Report* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

146.    In less than two years, between May 23, 2019 and March 25, 2021, Newsmax deceptively and fraudulently sold seven *Blaylock Wellness Report* subscriptions to Plaintiff.

147.    Newsmax charged Plaintiff a total of $792.65, for *Blaylock Wellness Report* over the course of almost twenty-two months.

**Dr. Crandall's Heart Health Report**

148.    On May 23, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Dr. Crandall's Heart Health Report*. Plaintiff was charged $4.95 shipping for this subscription.

149.    During that call on May 23, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Dr. Crandall's Heart Health Report* would activate after the "free" three-month trial period.

150.    Yet prior to the expiration of the "free" three-month trial period, on August 5, 2019, Defendant prematurely ended the "free trial" and charged Plaintiff $54.95, without his consent for a one-year subscription to *Dr. Crandall's Heart Health Report*.

151.    On January 16, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Dr. Crandall's Heart Health Report* for $49.95, despite Plaintiff's already active subscription.

152.     During that call on January 16, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dr. Crandall's Heart Health Report* was a "discount" and came with "automatic renewal" after one year.

153.     Outrageously, on February 1, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Dr. Crandall's Heart Health Report* for $49.95, despite Plaintiff's already active subscription.

154.     During that call on February 1, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dr. Crandall's Heart Health Report* was a "discount" and came with "automatic renewal" after one year.

155.     On July 17, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Dr. Crandall's Heart Health Report* for $54.95, despite Plaintiff's already active subscription.

156.     During that call on July 17, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dr. Crandall's Heart Health Report* was a "discount" and came with "automatic renewal" after one year.

157.     On March 24, 2021, Newsmax called Plaintiff again and sold him a three-year subscription to *Dr. Crandall's Heart Health Report* for $229.00, despite Plaintiff's already active subscription.

158.     During that call on March 24, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the three-year subscription to *Dr. Crandall's Heart Health Report* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

159.     Over the course of approximately two years, between May 23, 2019 and May 24, 2021, Newsmax deceptively and fraudulently sold five *Dr. Crandall's Heart Health Report*

subscriptions to Plaintiff.

160.    Newsmax charged Plaintiff a total of $432.65, for *Dr. Crandall's Heart Health Report* over the course of twenty-four months.

**Brownstein's Natural Way to Health**

161.    On May 23, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Brownstein's Natural Way to Health*. Plaintiff was charged $4.95 shipping for this subscription.

162.    During that call on May 23, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Brownstein's Natural Way to Health* would activate after the "free" three-month trial period.

163.    Yet prior to the expiration of the "free" three-month trial period, on August 5, 2019, Defendant prematurely ended the "free trial" and charged Plaintiff $54.95, without his consent for a one-year subscription to *Brownstein's Natural Way to Health*.

164.    On January 16, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Brownstein's Natural Way to Health* for $54.95, despite Plaintiff's already active subscription.

165.    During that call on January 16, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Brownstein's Natural Way to Health* was a "discount" and came with "automatic renewal" after one year.

166.    Outrageously, just two weeks later on February 1, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Brownstein's Natural Way to Health* for $54.95, despite Plaintiff's already active subscription.

167.    During that call on February 1, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Brownstein's Natural Way to Health* was

a "discount" and came with "automatic renewal" after one year.

168.    On June 23, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Brownstein's Natural Way to Health* for $54.95, despite Plaintiff's already active subscription.

169.    During that call on June 23, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Brownstein's Natural Way to Health* was a "discount" and came with "automatic renewal" after one year.

170.    On March 25, 2021, Newsmax called Plaintiff again and sold him a five-year subscription to *Brownstein's Natural Way to Health* for $229.00, despite Plaintiff's already active subscription.

171.    During that call on March 25, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the five-year subscription to *Brownstein's Natural Way to Health* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

172.    In less than two years, between May 23, 2019 and March 25, 2021, Newsmax deceptively and fraudulently sold four *Brownstein's Natural Way to Health* subscriptions to Plaintiff.

173.    Newsmax charged Plaintiff a total of $453.75, for *Brownstein's Natural Way to Health* over the course of almost twenty-two months.

**Financial Intelligence Report**

174.    On November 6, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Financial Intelligence Report*. Plaintiff was charged $4.95 shipping for this subscription.

175.    During that call on November 6, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Financial Intelligence Report* would activate after the "free" three-month trial period.

176.    Prior to the expiration of the "free" three-month trial period, on November 26, 2019, Defendant prematurely ended the "free trial" and charged Plaintiff $69.00, without his consent for a one-year subscription to *Financial Intelligence Report*.

177.    On November 27, 2019, Newsmax called Plaintiff again and resold him another "free trial" three-month subscription to *Financial Intelligence Report* despite Plaintiff's already active subscription. Plaintiff was charged another $4.95 shipping for this subscription.

178.    Prior to the expiration of the second "free" three-month trial period, on December 12, 2019, Defendant prematurely ended the "free trial" and charged Plaintiff $97.00, without his consent for a one-year subscription to *Financial Intelligence Report*.

179.    On January 30, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Financial Intelligence Report* for $69.00, despite Plaintiff's already active subscription.

180.    During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Financial Intelligence Report* was a "discount" and came with "automatic renewal" after one year.

181.    On August 3, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Financial Intelligence Report* for $69.00 despite Plaintiff's already active subscription.

182.    During that call on August 3, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Financial Intelligence Report* was a "discount" and came with "automatic renewal" after one year.

183.     In less than one year, between November 6, 2019 and August 4, 2020, Newsmax deceptively and fraudulently sold three *Financial Intelligence Report* subscriptions to Plaintiff.

184.     Newsmax charged Plaintiff a total of $313.90, for *Financial Intelligence Report* over the course of almost nine months.

**Franklin Prosperity Report**

185.     On May 23, 2019, Newsmax called Plaintiff and resold him a one-year subscription to *Franklin Prosperity Report* for $45.95, despite Plaintiff's already active subscription which began ten months prior.

186.     During that call on May 23, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Franklin Prosperity Report* was a "discount" and came with "automatic renewal" after one year.

187.     On January 16, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Franklin Prosperity Report* for $45.95, despite Plaintiff's already active subscription.

188.     During that call on January 16, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Franklin Prosperity Report* was a "discount" and came with "automatic renewal" after one year.

189.     On February 1, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Franklin Prosperity Report* for $19.95, despite Plaintiff's already active subscription.

190.     During that call on February 1, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Franklin Prosperity Report* was a "discount" and came with "automatic renewal" after one year.

191.    On July 17, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Franklin Prosperity Report* for $45.95, despite Plaintiff's already active subscription.

192.    During that call on July 17, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Franklin Prosperity Report* was a "discount" and came with "automatic renewal" after one year.

193.    Between May 23, 2019 and July 17, 2020, Newsmax deceptively and fraudulently sold four *Franklin Prosperity Report* subscriptions to Plaintiff.

194.    Newsmax charged Plaintiff a total of $227.75, for *Franklin Prosperity Report* over the course of almost fourteen months.

**Dividend Machine**

195.    On August 19, 2019, Newsmax called Plaintiff and sold him a "free trial" three-month subscription to *Dividend Machine*. Plaintiff was charged $4.95 shipping for this subscription.

196.    During that call on August 19, 2019, the salesperson for Newsmax represented to Plaintiff that the one-year subscription to *Dividend Machine* would activate after the three-month trial period and came with "automatic renewal" after one year.

197.    On November 12, 2019, Plaintiff's one-year subscription to *Dividend Machine* began and Plaintiff was charged $109.00, for this subscription, which Newsmax previously claimed came with "automatic renewal."

198.    On November 26, 2019, Newsmax called Plaintiff again and resold him a one-year subscription to *Dividend Machine* for $69.00, despite Plaintiff's already active subscription.

199.    During that call on November 26, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dividend Machine* was a "discount" and

came with "automatic renewal" after one year.

200.    On November 27, 2019, Newsmax called Plaintiff again and resold him another one-year subscription to *Dividend Machine* for $69.00, despite Plaintiff's already active subscription.

201.    During that call on November 27, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dividend Machine* was a "discount" and came with "automatic renewal" after one year.

202.    On January 30, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Dividend Machine* for $69.00, despite Plaintiff's already active subscription.

203.    During that call on January 30, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Dividend Machine* was a "discount" and came with "automatic renewal" after one year.

204.    In less than six months, between August 19, 2019 and January 1, 2020, Newsmax deceptively and fraudulently sold three *Dividend Machine* subscriptions to Plaintiff.

205.    Newsmax charged Plaintiff a total of $320.95, for *Dividend Machine* over the course of almost five months.

**High Income Factor**

206.    On March 3, 2020, Newsmax called Plaintiff and sold him a one-year subscription to *High Income Factor* for $97.00.

207.    During that call on March 3, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *High Income Factor* came with "automatic renewal."

208.    On July 8, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *High Income Factor* for $97.00, despite Plaintiff's already active subscription.

209.     During that call on July 8, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *High Income Factor* was a "discount" and came with "automatic renewal."

210.     On February 16, 2021, Newsmax called Plaintiff again and sold him a two-year subscription to *High Income Factor* despite Plaintiff's already active subscription.

211.     During that call on February 16, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the two-year subscription to *High Income Factor* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

212.     In less than one year, Newsmax deceptively and fraudulently sold two *High Income Factor* subscriptions to Plaintiff.

213.     Newsmax charged Plaintiff a total of $343.00, for *High Income Factor* over the course of almost twelve months.

**Ultimate Wealth Report**

214.     On March 4, 2020, Newsmax called Plaintiff and sold him a one-year subscription to *Ultimate Wealth Report* for $97.00.

215.     During that call on March 4, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Ultimate Wealth Report* came with "automatic renewal."

216.     On July 8, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Ultimate Wealth Report* for $69.00, despite Plaintiff's already active subscription.

217.     During that call on July 8, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Ultimate Wealth Report* was a "discount" and came with "automatic renewal."

218.     Between March 4, 2020 and July 8, 2020, Newsmax deceptively and fraudulently sold one *Ultimate Wealth Report* subscription to Plaintiff.

219.     Newsmax charged Plaintiff a total of $166.00, for *Ultimate Wealth Report* over the course of four months.

**Spetrino Inner Circle**

220.     On November 26, 2019, Newsmax called Plaintiff and sold him a one-year subscription to *Spetrino Inner Circle* for $397.00.

221.     During that call on November 26, 2019, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Spetrino Inner Circle* came with "automatic renewal."

222.     On September 18, 2020, Newsmax called Plaintiff again and resold him another one-year subscription to *Spetrino Inner Circle* for $395.00, despite Plaintiff's already active subscription.

223.     During that call on September 18, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Spetrino Inner Circle* was a "discount" and came with "automatic renewal."

224.     On February 15, 2021, Newsmax called Plaintiff again and sold him a "three-month extension" to *Spetrino Inner Circle* for $279.00, despite Plaintiff's already active subscription.

225.     During that call on February 15, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the "three-month extension" to *Spetrino Inner Circle* was a "discount" and came with "automatic renewal."

226.     In less than two years, between November 27, 2019 and February 15, 2021, Newsmax deceptively and fraudulently sold two *Spetrino Inner Circle* subscriptions to Plaintiff.

227.    Newsmax charged Plaintiff $2,070.00 for *Spetrino Inner Circle* over the course of almost fifteen months.

**Invest with the Insiders**

228.    On September 18, 2020, Newsmax called Plaintiff and sold him a one-year subscription to *Invest with the Insiders* for $149.00.

229.    During that call on September 18, 2020, the salesperson for Newsmax falsely represented to Plaintiff that the one-year subscription to *Invest with the Insiders* came with "automatic renewal."

230.    On February 20, 2021, Newsmax called Plaintiff again and sold him a new two-year subscription to *Invest with the Insiders* for $249.00, despite Plaintiff's already active subscription.

231.    During that call on February 20, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the two-year subscription to *Invest with the Insiders* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

232.    On March 24, 2021, Newsmax called Plaintiff again and resold him another two-year subscription to *Invest with the Insiders* for $249.00, despite Plaintiff's already active subscription.

233.    During that call on March 24, 2021, the salesperson for Newsmax falsely represented to Plaintiff that the two-year subscription to *Invest with the Insiders* was a "discount" and came with "automatic renewal" after one year and would continue to automatically renew "at the lowest rate every year thereafter."

234.    In less than one year, between September 18, 2020 and March 24, 2021, Newsmax deceptively and fraudulently sold two *Invest with the Insiders* subscriptions to Plaintiff.

235.    Newsmax charged Plaintiff $896.00, for *Invest with the Insiders* over the course of almost six months.

## Newsmax Knew It Was Dealing with a 90-Plus Year-Old Man with Limited Cognitive Abilities

236.    On August 19, 2019 Newsmax called Mr. Cohen. It was just the second telephone call Newsmax made to the Plaintiff, and during that call, the Newsmax representative asked Mr. Cohen how old he was. He told her he was 92 years old. The Newsmax sales representative said to Mr. Cohen, "Wow, you don't sound like it. Anyways…"

237.    Over the next 22-months Newsmax targeted the Plaintiff and called him more than 50 times. They preyed on him because they knew his age and could hear his tentative, confused, uncertain, often vague answers to their high-pressure sales tactics. Anyone who spoke with this 92-year-old man could readily ascertain his limited cognitive abilities.

238.    Newsmax sales agents repeatedly heard Mr. Cohen say he didn't want certain products and they would quickly segue to selling him another product; and then call him again just a few later and attempt to re-sell him a product he previously said he didn't want. On several occasions Newsmax simply ignored Mr. Cohen's express instructions that he did not want a product and charged his credit or debit card without his permission.

## Plaintiff's Caregiver Cancels Newsmax Subscriptions – the First Time

239.    On January 18, 2021, Elizabeth Casper, who works as one of Mr. Cohen's care managers, called Newsmax's customer service phone number to cancel Plaintiff's subscriptions with Defendant.

240.    During that call on January 18, 2021, a customer service representative for Newsmax cancelled Plaintiff's subscriptions to ten different Newsmax publications.

241.    After cancelling said subscriptions, Ms. Casper requested refunds for each of the cancelled subscriptions. Ms. Casper further requested Plaintiff be placed on Defendant's internal do not call list. The Newsmax customer service representative stated: "I am taking his information out of our system, so he doesn't have to worry about this again…[his] account is cancelled for good."

242.    On January 19, 2021, Newsmax sent refunds for numerous one-year subscriptions to *Health Radar*, *Mind Health Report*, *Dr. Crandall's Heart Health Report*, *Financial Intelligence Report*, *Blaylock's Wellness Report*, *High Income Factor*, *Newsmax Magazine*, *Ultimate Wealth Report*, *Dr. Brownstein's Natural Way to Health*, and *Dividend Machine.* A total of $1,565.95, was sent to Plaintiff's Citibank and Discover card accounts.

## Newsmax Unilaterally Reactivates Subscriptions and Charges Plaintiff -- the First Time

243.    Despite Newsmax's representation on January 18, 2021, that Plaintiff's account was cancelled, on February 15, 2021, Newsmax reactivated Plaintiff's account without his knowledge or consent and resold a new "three-month extension" to *Spetrino Inner Circle* to Plaintiff on the phone for $279.00.

244.    On February 16, 2021, Newsmax called Plaintiff again and resold him a (1) five-year subscription to *Blaylock Wellness Report* for $229.00; (2) two-year subscription to *High Income Factor* for $149.00; and (3) *two-year* subscription to *Newsmax Magazine* for $89.95.

245.    On February 20, 2021, Newsmax called Plaintiff again and resold him a two-year subscription to *Invest with the Insiders* for $249.00.

246.    On February 22, 2021, Newsmax called Plaintiff again and resold him a (1) five-year subscription to *Dr. Brownstein's Natural Way to Health* for $229.00 and (2) one-year subscription to *Dr. Crandall's Heart Health Report* for $54.95.

**Plaintiff's Caregiver Cancels Newsmax Subscriptions for the Second Time**

247.    On February 24, 2021, Plaintiff's caregiver Ms. Casper called Newsmax a second time to cancel Plaintiff's unwanted subscriptions and request a refund for each cancelled subscription. Ms. Casper again requested Plaintiff be put on Newsmax's internal do not call list.

248.    During that call on February 24, 2021, a customer service representative for Newsmax assured Ms. Casper that Plaintiff's Newsmax account was cancelled, and his phone number blocked.

249.    On February 24, 2021, Newsmax sent refunds for numerous subscriptions to *Newsmax Magazine*, *Dr. Brownstein's Natural Way to Health*, *Health* Radar, *Blaylock's Wellness Report*, *Mind Health Report*, *Dividend Machine*, *Financial Intelligence Report*, *Invest with the Insiders*, *and Spetrino Inner Circle.* A total of $1,243.35, was sent to Plaintiff's Citibank and Discover card accounts.

**Newsmax Reactivates Subscriptions and Charges Plaintiff for the Second Time**

250.    Despite Newsmax's representation on February 24, 2021, that Plaintiff's account was cancelled, on March 24, 2021, Newsmax reactivated Plaintiff's account without his knowledge or consent and resold a (1) three-year subscription to *Newsmax Magazine* for $89.95 and (2) two-year subscription to *Invest with the Insiders* for $249.00.

251.    Later that day on March 24, 2021, Newsmax called Plaintiff again and resold him a three-year subscription to *Dr. Crandall's Heart Health Report* for $129.00.

252.    On March 25, 2021, Newsmax called Plaintiff again and resold him a (1) five-year subscription to *Blaylock's Wellness Report* for $229.00 and (2) five-year subscription to *Dr. Brownstein's Natural Way to Health* for $229.00.

253.    Overall, Newsmax fraudulently charged Plaintiff a total of $2,115.90 *after* Plaintiff cancelled and blocked all Newsmax subscriptions.

**<u>Newsmax Charges Plaintiff Without Contacting Him</u>**

254.    On at least four separate occasions, Newsmax charged Plaintiff for subscriptions without first calling or otherwise contacting him.

255.    On December 13, 2020, Newsmax charged Plaintiff $69.95, for *Franklin Prosperity Report* without first calling or otherwise contacting him. This charge was not an "automatic renewal."

256.    On December 13, 2020, Newsmax charged Plaintiff $87.95, for *Dr. Crandall's Heart Health Report* without first calling or otherwise contacting him. This charge was not an "automatic renewal."

257.    On December 13, 2020, Newsmax charged Plaintiff $249.00, for *Invest with the Insiders*. This charge was not an "automatic renewal."

258.    On December 15, 2020, Newsmax charged Plaintiff $999.00, for *Spetrino Inner Circle*. This charge was not an "automatic renewal."

259.    Over the course of two days, Newsmax, without ever calling or contacting Plaintiff, fraudulently charged him a total of $1,405.90 in unauthorized subscription fees.

**<u>COUNT I</u>**
**<u>VIOLATION OF THE TCPA 47 U.S.C. § 227</u>**
**<u>On Behalf of Plaintiff and the Do Not Call Registry Class</u>**

260.    Plaintiff incorporates by reference all of the allegations above as though fully stated herein.

261.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

262.    This prohibition applies to telephone solicitations directed to both residential landlines and to consumers' wireless numbers.  See, 47 C.F.R. § 64.1200(e).

263.    47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."

264.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

265.    Defendant violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the Do Not Call Registry Class members who registered their respective telephone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

266.    Defendant violated 47 U.S.C. § 227(c)(5) because Plaintiff and the Do Not Call Registry Class received more than one telephone call in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendant's conduct as alleged herein, Plaintiff and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are entitled, *inter alia*, to receive up to $500 in damages for such violations of 47 C.F.R. § 64.1200.

267.    To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages

recoverable by the members of the Do Not Call Registry Class.

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff and the Class relief against Defendant, individually and jointly, as set forth in the Prayer for Relief below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and in favor of the class, against Defendant for:

a.     An order certifying this case as a class action, certifying Plaintiff as representative of the Class, and designating Plaintiff's attorneys Class counsel;

b.     Statutory damages of $500 per call in violation of the Do Not Call Registry;

c.     Willful damages of $1,500 per call in violation of the Do Not Call Registry;

d.     A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)(5);

e.     An injunction prohibiting Defendant's from calling DNC-registered numbers without the prior express written consent of the called party;

f.     Reasonable attorney's fees and costs; and

g.     Such further and other relief as this Court deems reasonable and just.

**COUNT II**
**VIOLATION OF THE TCPA 47 U.S.C. § 227**
**On Behalf of Plaintiff and the Internal Do Not Call Class**

268.     Plaintiff repeats and realleges all the paragraphs above in this Complaint and incorporates them by reference herein,

269.     Under 47 C.F.R. § 64.1200(d), "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintain a list of persons who request not to receive telemarketing calls

made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such a request is made. This period may not exceed thirty days from the date such request is made. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity made be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long-distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made),and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

270.     Defendant placed calls to Plaintiff and members of the Internal Do Not Call Class on behalf of the Defendant without implementing internal procedures for maintaining a list of persons who request not to be called by the entity and/or by implementing procedures that do not meet the minimum requirements to allow the Defendant to initiate telemarketing calls.

271.     The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c)(5).

272.     The Defendant has, therefore, violated 47 U.S.C. § 227(c)(5). As a result of Defendant's conduct, Plaintiff and the other members of the Internal Do Not Call Class are each entitled to up to $1,500 per violation.

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff relief against Defendant as set forth in the Prayer for Relief below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and in favor of the class, against Defendant for:

a.     An order certifying this case as a class action, certifying Plaintiff as representative of the Class, and designating Plaintiff's attorneys Class counsel;

b.     Statutory damages of up to $500 per call in violation of the Do Not Call Registry;

c.     Willful damages of $1,500 per call in violation of the Do Not Call Registry;

d.     A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)(5);

e.     An injunction prohibiting Defendant's from calling DNC-registered numbers without the prior express written consent of the called party;

f.     Reasonable attorney's fees and costs; and

g.     Such further and other relief as this Court deems reasonable and just.

### COUNT III
### VIOLATION OF THE FDUTPA
### Fl. St. § 501.201 et seq.
### On Behalf of Plaintiff Bernard Cohen, Individually

273.    Plaintiff incorporates by reference all of the allegations contained in all the paragraphs above as though fully stated herein.

274.    In Florida, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

275.    At all times relevant, Plaintiff, and at all times mentioned herein was, a "consumer" as defined by Fla. Stat. § 501.203(7) and, as such, is entitled to the protection of the FDUTPA.

276.    At all times relevant, Defendant conducted business in the State of Florida and in Palm Beach County, within this judicial district.

277.    At all times relevant, Defendant engaged in commerce in the State of Florida as defined by Fla. Stat. § 501.203(8) and is therefore subject to the provisions of the FDUTPA.

278.    In selling magazine and news subscriptions, Defendant was required to be honest in its dealings and not engage in any actions that had the effect of deceiving consumers.

279.    By reason of the conduct alleged herein, Defendant engaged in unfair and deceptive business practices in violation of the FDUTPA.

280.    Defendant violated the FDUTPA by making affirmative misrepresentations regarding the subscriptions it sold to Plaintiff, including but not limited to, misrepresentations regarding the pricing, terms, length and renewal of the subscriptions.

281.    Defendant's conduct and practice, as described above, of continuously calling Plaintiff and repeatedly charging him for the same subscriptions, including by way of premature and fraudulent renewals and unauthorized charges, violated the FDUTPA.

282.    Defendant's telephone advertising, sales, billing and renewal practices regarding its magazine subscriptions are unconscionable and constitute unfair and deceptive methods of competition in violation of one or more of the following:

    a.    The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or by the federal courts, as set forth in FDUPTA, §§ 501.203(3)(b) and 501.204; and/or

    b.    The law against unfair and deceptive trade practices set forth in 15 U.S.C. §§ 45(a)(1) and incorporated into FDUTPA, §§ 501.203(3)(c) and 501.204.

283.    Defendant's conduct and subscription sales practices offend established public policies, and are unfair, immoral, unethical, oppressive, abusive, exploitative and unscrupulous.

284.    As a result of these unfair and deceptive trade practices, Plaintiff has suffered actual damages, including but not limited to significant financial hardship, mental anguish, enormous anxiety and emotional distress.

285.    As a result of the aforementioned conduct, Plaintiff is entitled to permanent injunctive relief to prevent Defendant from continuing to engage in these unfair and deceptive trade practices and to stop the offending conduct.

286.    Pursuant to Florida Statute § 501.2105, Plaintiff is entitled to recover costs and reasonable attorneys' fees in this action.

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff relief against Defendant as set forth in the Prayer for Relief below.

## PRAYER FOR RELIEF

a.      WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor

and against Defendant for:

b.      Actual damages pursuant to Fl. Sat. § 501.211(2);

c.      A declaration that Defendant has engaged in unfair, unconscionable, and deceptive

business practices, in violation of the FDUTPA as set forth in Fl. Stat. § 501.211(1);

d.      Reasonable attorney's fees and costs pursuant to Fl. Stat. § 501.211; and

e.      Such further and other relief as this Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: July 29, 2021                         Respectfully submitted,

*/s/ Seth M. Lehrman*
Seth M. Lehrman (FBN 132896)
E-mail: seth@epllc.com
EDWARDS POTTINGER LLC
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
Telephone: 954-524-2820
Facsimile: 954-524-2822

Steve Cohen *(Pro Hac Vice to be sought)*
E-mail: Scohen@PollockCohen.com
POLLOCK COHEN LLP
60 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212-337-5361

Daniel Schlanger *(Pro Hac Vice to be sought)*
E-mail: dschlanger@consumerprotection.net
SCHLANGER LAW GROUP, LLP
80 Broad St., Suite 1301
New York, NY 10004
Telephone: 212-500-6114

*Counsel for Plaintiff*